THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GARY L. FINDLAY, Defendant-Appellant.

Second District   No. 2—87—0948

Opinion filed December 29, 1988.

Richard D. Felice, of Wheaton (Ralph J. Gust, Jr., of counsel), for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant, Gary Findlay, appeals from his conviction after a bench trial on one count of aggravated criminal sexual abuse (Ill. Rev. Stat. 1985, ch. 38, par. 12—16(d)). Defendant was sentenced to three years' probation subject to 180 days' incarceration in the Du Page County jail and submission to a psychological evaluation and counseling if recommended. Defendant was also fined $1,000 plus costs. On appeal, defendant contends that (1) the State failed to prove him guilty beyond a reasonable doubt, and (2) the trial court improperly restricted questioning of a defense witness regarding a conversation between the witness and defendant. We reverse.

Because defendant contends that the State failed to prove him guilty beyond a reasonable doubt, a detailed statement of facts is necessary. At the time of trial, defendant was 32 years old and had been employed with the United States Air Force for 13 years. In the course of his employment, defendant held a variety of positions and had top-secret security clearance. In February 1978, defendant became affiliated with the Boy Scouts of America and has held a variety of leadership positions with that organization. Defendant met Jeffery Echols, the victim in the instant action, at a scouting event in the fall of 1984. At that time, Echols was 14 years old and had been in scouting for approximately eight years. During the course of the next year,

defendant began to attend and participate in the activities of Echols' troop.

In October 1985, defendant was the chapter advisor, fellowship advisor, and assistant scout master for Echols' troop. At that time, the Boy Scouts of America introduced a new scouting program called varsity scouting. The program was designed for boys between the ages of 14 and 17 and provided a group organization where the boys determined the functions of their own unit. Defendant obtained information about the new program and formed a varsity scouting unit consisting of six of the older boys from the troop. Echols was appointed to the position of youth leader for this unit on the basis that he was the member with the highest rank. The duties of the youth leader included running the meetings of the unit and forming a communication between the boys and the adult leaders.

According to defendant, Echols performed poorly as a youth leader. Defendant stated that from approximately November 1985, through the spring of 1986, defendant had several private conversations with Echols regarding his performance as a youth leader and at one time threatened to remove him from his leadership role. Robert Bergmann, another adult leader with the troop, also noted that Echols was not performing satisfactorily and testified that he had conversations with defendant concerning discharging Echols from his position. Bergmann was not permitted to testify regarding the content of his statements to defendant about discharging Echols.

Despite this testimony regarding Echols' poor leadership, other witnesses testified that Echols and defendant had a close relationship. Echols testified that defendant phoned him two to three times per week for 45 minutes at a time. Echols' father testified that on a fishing trip held in June 1986, defendant spent a great deal of time with his son and constantly bragged about him to the other boys. He further stated that defendant was constantly patting and putting his arm around Echols. Echols' father also testified regarding an incident in December 1985, when he observed Echols and defendant emerge from a dark classroom during a scouting function. Defendant told Echols' father that they were discussing scout business.

On August 6, 1986, defendant was charged by indictment with five counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1985, ch. 38, par. 12—16(d)). The indictments were returned after Echols reported, first to his parents and subsequently to Du Page County authorities, that defendant had sexual contact with him on a number of occasions in 1985 and 1986. Count I alleged that defendant committed an act of fellatio upon Echols on August 19, 1985, between 4 and 5

p.m. Count II alleged that defendant committed an act of fellatio upon Echols on October 5, 1985, between 2 and 3 p.m. Count III alleged that defendant committed an act of fellatio upon Echols on or about November 9, 1985, sometime in the afternoon or evening hours. Count IV alleged that defendant committed an act of anal intercourse with Echols on or about October 26, 1985. Count V alleged that defendant committed an act of fellatio upon Echols on February 19, 1986, between 7 and 7:30 p.m. The trial court granted the State's motion to nol-pros counts II and V of the indictment, and the trial on the remaining counts commenced on May 26, 1987.

The State first presented evidence regarding the August 19, 1985, incident charged in count I. Echols testified that between 2 and 3 p.m. on that date, he and defendant went swimming in the swimming pool at defendant's apartment complex. Echols stated that they entered and exited the pool through a locker room. According to Echols, they finished swimming around 3 or 4 p.m. and went to defendant's apartment, where defendant committed an act of fellatio upon Echols. However, Echols' testimony was contradicted by Michelle Butterfield, the property manager at defendant's apartment complex. According to Butterfield, the pool at defendant's apartment complex was closed on August 19, 1985, between 1 and 5 p.m. Butterfield further stated that the entrances to the pool, including the locker room, would have been secured at that time, and that only she and her staff had keys to those entrances. Echols' testimony was also contradicted by defendant. Defendant testified that on August 19, 1985, he was employed by the United States Postal Service at O'Hare Airport. Defendant testified that he was at work between 6 a.m. and 3 p.m. on that date, and stated that he said goodnight to Carol Zaehler, a postal service technician, on his way out of work. Defendant further testified that he did not arrive at his apartment until approximately 3:45 or 4 p.m. Defendant's alibi was corroborated by Zaehler, who testified that on August 19, 1985, she saw defendant at approximately 3 p.m. when he came past the control center and said goodnight.

The State next presented evidence regarding an incident occurring on September 28, 1985, or September 29, 1985. Although this evidence was not the subject of any of the counts of the indictment, the trial court permitted its introduction to show the familiarity and relationship between the parties and as corroboration of Echols' testimony as to the acts charged in the five-count indictment. According to Echols, defendant took him and Todd Ellermeier, another scout, practice driving in defendant's car while at Waubonsee College for a scouting event. Echols testified that they dropped Ellermeier off and

subsequently pulled into the entrance of a quarry to change drivers. At that time, defendant committed an act of fellatio upon Echols while the two of them were in defendant's car. While Ellermeier and defendant both acknowledged that the three of them went driving in defendant's car and that defendant dropped Ellermeier off first, defendant denied any sexual contact with Echols.

The State next presented evidence regarding the October 5, 1985, incident charged in count II, which had previously been nol-prossed by the State. The court permitted this evidence over defendant's objection. Echols testified that while camping at a scout function in Yorkville, defendant drove him to a different campsite approximately five miles from where the scouting organization was located and committed an act of fellatio upon him. According to Echols, the incident occurred between 2 and 3 p.m., and they were away from the Yorkville camp for approximately one hour. Although Echols stated that three people including his father were present when they left and arrived back at the campsite, none of those people testified that they saw Echols and defendant either leave or return to the campsite on that date. Echols' testimony was in fact contradicted by Helen Hunter and Ronald Netzband, who testified that they saw defendant's car parked in one of the spaces immediately adjacent to the fort in which they were camping at Yorkville. Hunter testified that she noticed no movement of defendant's car on that date and that it appeared to be parked in the same place from the morning of October 5, 1985, to the morning of October 6, 1985. Netzband testified that defendant's car never moved from the parking area on October 5, 1985, and he did not see it move until approximately 10 a.m. on October 6, 1985, when they all departed. Netzband further testified that he was with defendant between 2 and 4:45 p.m. on October 5, 1985. Robert Bergmann also testified that he saw defendant on various occasions on October 5, 1985, and that defendant did not leave his presence between 2:30 and 3:30 p.m. Defendant testified that he was at the camp all day and that he was with Netzband until 4 p.m., at which time they started dinner.

The State next presented evidence regarding the October 26, 1985, incident charged in count IV. Echols testified that while participating in a scouting event at Camp Thunderbird, he and defendant drove back to defendant's apartment because they had forgotten something. Echols stated that they left the campsite at approximately 9 p.m. that evening and did not return until 11:30 p.m. According to Echols, defendant committed an act of fellatio upon Echols and attempted to have anal intercourse with him while at defendant's apart-

ment. Defendant denied the allegation and further testified that he was present for three ceremonies conducted at the camp between 9 and 10:30 p.m. on that date. During the third ceremony, at approximately 10:30 p.m., defendant "tapped out" (a term used to describe a scouting honor) Jim Hunter, and remained with him until approximately 12:30 p.m. Defendant's testimony was corroborated by Hunter, who testified that he saw defendant at approximately 10:30 p.m. during a vigil ceremony at which time defendant pulled him out of the crowd in the "tap-out" ceremony. Hunter stated that he was with defendant between 10:30 and 12:30 p.m. Hunter's father, Netzband, and Bergmann similarly testified that they saw or were with defendant on October 26, 1985, at approximately 10:30 p.m. Netzband further testified that defendant did not leave his presence between 9 and 10:30 p.m.

The State next presented evidence regarding the November 9, 1985, incident charged in count III. According to Echols, the varsity unit participated in an outing at Pratt Wayne Woods on that date. It began to rain, and the unit went to defendant's apartment for a meeting. Echols stated that they arrived at defendant's apartment at approximately 8 or 9 p.m. In addition to Echols, defendant, Jeff House, Dan Nelson, and Brian Zinser were present. Echols stated that the unit ate dinner and watched movies before going to bed. Echols further testified that they all went to bed around 10 or 11 p.m., and that he slept on the floor in defendant's bedroom. Approximately one-half hour after going to bed, defendant told Echols to get into his bed, at which time defendant committed an act of fellatio upon Echols for approximately 15 minutes. Echols stated that defendant then removed his shorts and tried to have anal intercourse with him. Echols stated that defendant put his penis into Echols' anus and tried to push for a couple of minutes. Echols further testified that it was painful when defendant attempted to have anal intercourse, but that he did not make any noise during the attempted penetration since there were people in the next room who could hear. Echols testified that the doors to defendant's bedroom were closed at the time. According to Echols, the entire incident lasted approximately one hour, and he and defendant were on defendant's bed during that time. House and Nelson also testified for the State and stated that House slept on the couch in the living room, Zinser slept on the floor in the living room, Nelson slept in the guest room, and Echols and defendant slept in defendant's room. According to House, defendant's bedroom opened into both the hallway and bathroom, and both doors were closed. House further testified that defendant's bedroom was approximately

15 feet from the couch in the living room on which he was sleeping, but he did not hear any sounds coming from the bedroom. Nelson testified that he did not know whether defendant's bedroom doors were open or closed. Nelson stated that he did not fall asleep right away and was probably awake approximately one hour after he went to bed. Nelson further testified that the guest bedroom where he slept was located approximately two feet from defendant's bedroom, but he did not hear any sounds coming from the bedroom. Defendant testified that Echols slept on a rug in his bedroom that night, but denied ever asking him to come onto his bed. Defendant stated that his bedroom doors were open to circulate the heat, and further stated that his bed is 30 years old and makes a lot of noise. Defendant's testimony was partially corroborated by Sharon Elwood, who testified that in November 1985, she was at defendant's apartment and had occasion to sit on defendant's bed. Elwood testified that defendant's bed made a loud squeak. Bergmann also testified that he was in defendant's apartment in November 1985 and noticed that defendant's bed "squeaked like crazy."

The State did not present any evidence regarding the February 19, 1986, incident charged in count V, which was previously nolprossed by the State. However, the court did allow the State to introduce evidence regarding an incident occurring at defendant's apartment on February 26, 1986. Echols testified that defendant picked him up at approximately 6 p.m. to go to an executive board meeting on that date. Echols stated that defendant took him to defendant's apartment between 6:30 and 7 p.m. at which time defendant committed an act of fellatio upon him. Echols further testified that he and defendant went to the meeting after this sexual contact. Echols' testimony was contradicted by defendant, Netzband, and Bergmann, who all testified that there was not an executive board meeting on February 26, 1986. Furthermore, Sharon Elwood testified that she was with defendant from approximately 5:30 to 9:15 p.m. on February 26, 1986, and that defendant called her at approximately 9:45 p.m. when he returned to his apartment.

On June 18, 1987, the case came before the trial court for a decision. The court noted that in a sexual abuse case where there is no eyewitness testimony and where the defendant denies the charge, the complaining witness' testimony must either be clear and convincing or substantially corroborated. The court further stated that it believed that some "acts of the nature alleged in the indictment did occur." However, the court found defendant not guilty as to counts I and IV of the indictment, which alleged the sexual contacts occurring on Au-

gust 19, 1985, and October 26, 1985. As to each of those counts, the court concluded that Echols' testimony was not clear and convincing and was not substantially corroborated. However, the court found defendant guilty as to count III of the indictment, which alleged the sexual contact on November 9, 1985. Although the court did not expressly comment on whether Echols' testimony was clear and convincing, the court concluded that it was sufficiently corroborated, stating:

> "It is the opinion of the Court there was sufficient corroboration of Jeff Echols' testimony to this incident occurring. There is no question but that they were there at that time, that they were there on that date, they were there about the approximate hour testified to by everybody. There is no question but that the defendant had Jeff Echols retire in his bedroom. *** The question of whether the bedroom doors of that master bedroom were open or closed assumes some great degree of importance here, and the fact that those doors were closed is corroborated by the testimony of Jeff House, that he got up during the night and saw that the doors were closed.
>
> All in all, I think as far as that count is concerned, I think there is sufficient corroborative evidence as to Count III and there will be a finding of guilty."

Defendant's motion for a new trial was heard on September 1, 1987, and denied. Defendant filed this timely appeal after imposition of sentence.

■ Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt. Defendant argues that Echols' testimony was neither clear and convincing nor substantially corroborated to such an extent as to sustain defendant's conviction on count III. We agree.

Our supreme court has noted that in cases charging a defendant with a sexual offense of this type, the charges are "easily made, hard to be proved, and harder to be defended by the party accused." (*People v. Nunes* (1964), 30 Ill. 2d 143, 146; see also *People v. Daniels* (1987), 164 Ill. App. 3d 1055, 1073.) Thus, the court has stated that the reviewing courts in such cases are especially charged with the duty to carefully examine the evidence, and while due weight must be given to the judgment of the trier of fact as to the credibility of the witnesses, the court has the duty to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and create an abiding conviction that he is guilty of the crime charged. (*Nunes*, 30 Ill. 2d at 146.) Accordingly, in cases where a defendant convicted of aggravated criminal sexual abuse denies the

charge, the conviction will be upheld only where the complainant's testimony is clear and convincing, or where it is substantially corroborated by other evidence. *Daniels*, 164 Ill. App. 3d at 1073; *People v. Server* (1986), 148 Ill. App. 3d 888, 895.

We note that in rendering its decision in the instant action, the trial court found that Echols' testimony as to counts I and IV was neither clear and convincing nor substantially corroborated. However, the court did not make an express finding on the character of Echols' testimony as to count III. Rather, the court stated that it found "sufficient corroboration of Jeff Echols' testimony" to support the conclusion that the incident occurred. While it would appear in the context of the decision that the court did not find Echols' testimony to be clear and convincing as to count III, this court is not asked to make that presumption.

■ A complainant's testimony is clear and convincing where it is consistent and where discrepancies do not detract from its reasonableness. (*People v. Escobedo* (1986), 151 Ill. App. 3d 69, 81-82; see also *People v. Thompson* (1978), 57 Ill. App. 3d 134, 140.) The complainant's testimony need not be unimpeached, uncontradicted, crystal clear, or perfect to be clear and convincing. (*Daniels*, 164 Ill. App. 3d at 1073; *People v. Sexton* (1987), 162 Ill. App. 3d 607, 612.) Rather, any weaknesses in the testimony such as the inability to remember exact dates and times, as well as other minor contradictions or inconsistencies, only affect the weight to be given the testimony and do not themselves create a reasonable doubt. (*Sexton*, 162 Ill. App. 3d at 612; *Escobedo*, 151 Ill. App. 3d at 82; see also *People v. Brisbon* (1985), 106 Ill. 2d 342, 360.) As long as the discrepancies "do not detract from the reasonableness of the complainant's story as a whole," the testimony may be found clear and convincing. *People v. Nelson* (1986), 148 Ill. App. 3d 811, 821; see also *People v. Payton* (1980), 84 Ill. App. 3d 181, 183.

■ Relying on some of the impeachment evidence presented by defendant in the instant action, the trial court found that Echols' testimony regarding counts I and IV was not clear and convincing. The trial court is in the best position to judge the credibility of the witnesses, and we will not substitute our judgment for that of the trier of fact. (See *Nelson*, 148 Ill. App. 3d at 821.) However, because the trial court did not state its finding regarding the credibility of Echols' testimony when it rendered its decision on count III, we have reviewed the record in its entirety to determine whether the impeachment of Echols' testimony substantially "detract[s] from the reasonableness of [Echols'] story as a whole" such that it should fail the

clear and convincing test as to count III as well. (See 148 Ill. App. 3d at 821.) The record indicates that Echols' testimony regarding four of the alleged incidents, three of which were indicted offenses, was wholly impeached by the defense. Echols' testimony regarding the August 19, 1985, incident occurring after he and defendant went swimming in the pool at defendant's apartment complex between 2 and 3 p.m. was impeached by both the manager of the apartment complex, who testified that the pool was closed and secured on that date, and defendant's co-worker, who testified that she saw him at work at approximately 3 p.m. Echols' testimony regarding the October 5, 1985, incident occurring between 2 and 3 p.m. was impeached by other scout leaders, who testified that defendant's car did not move from its parking spot on that date, and that they saw or were with defendant from approximately 2 or 2:30 p.m. to approximately 3:30 or 4 p.m. Echols' testimony regarding the October 26, 1985, incident occurring at defendant's apartment between 9 and 11:30 p.m. was impeached by another scout and three scout leaders who testified that they either saw or were with defendant at a scouting function from 9 to 12:30 p.m. on that date. Finally, Echols' testimony regarding that February 26, 1986, incident occurring at approximately 6:30 p.m. on the way to an executive board meeting was impeached by two scout leaders who testified that there was not an executive board meeting on that date, and a third witness who testified that defendant was with her from approximately 5:30 to 9:15 p.m. on that night. Viewing the record as a whole, we are of the opinion that these episodes of impeachment are not minor, but rather substantial, and seriously and substantially detract from Echols' story as a whole. (See *People v. Morgan* (1977), 69 Ill. 2d 200, 206 (victim's testimony was not clear and convincing since her veracity and credibility were seriously brought into question by other witnesses indicating that the victim had the propensity to fabricate).) The pervasiveness of the impeachment in Echols' testimony does not give rise to an inference that he was merely unable to remember exact dates or times. Indeed, Echols gave no indication that he was unsure of the dates or times, and clearly and confidently stated those alleged as accurate. This demonstration of certainty when viewed against the backdrop of the numerous instances of impeachment supports a conclusion that Echols' testimony was insufficient to meet the clear and convincing standard.

The State nonetheless argues that Echols' testimony on count III must be isolated from his testimony regarding the other incidents. Even if we were to view Echols' testimony on count III in isolation, it

would not meet the clear and convincing standard. Echols' testimony places him and defendant on defendant's bed for approximately one hour during which defendant committed an act of fellatio upon Echols and further attempted to have anal intercourse with him. The incident occurred at approximately 11 p.m., and Echols testified that it was painful. However, despite defense testimony that defendant's bed squeaks loudly, two other scouts sleeping 2 and 15 feet away from defendant's bedroom testified that they did not hear any noises coming from that room. Moreover, one of the scouts testified that he went to bed at approximately 10:30 p.m. and was awake for about one hour. Thus, the record indicates that Echols' testimony was not so clear and convincing as to sustain defendant's conviction on count III. Such a conclusion would appear to be consistent with the trial court's decision given its findings as to counts I and IV and its statement on count III that Echols' testimony was "sufficiently corroborated" by House and Nelson.

■■ Of course, our conclusion that Echols' testimony was not clear and convincing does not end the inquiry. Where the testimony of the victim is not clear and convincing, the conviction may be sustained where it is substantially corroborated by some other factual evidence or circumstance. (See *People v. Server* (1986), 148 Ill. App. 3d 888, 895.) Corroborating evidentiary matters include an eyewitness account, confession or admission by the defendant, prompt reporting of the incident by the victim, or medical testimony which supports the allegations of abuse. *Server*, 148 Ill. App. 3d at 895; *In re B.J.S.* (1987), 151 Ill. App. 3d 1023, 1026-27.

In the instant action, the trial court found Echols' testimony corroborated by evidence indicating that Echols had a close relationship with defendant, and by House and Nelson's testimony that all of the parties were at defendant's apartment on the night in question and that Echols slept in defendant's bedroom with the doors closed. While these factors are not included among those listed as corroborating evidentiary matters in such a case (see *Server*, 148 Ill. App. 3d at 895; *In re B.J.S.*, 151 Ill. App. 3d at 1026-27), the State argues that the factors listed in those cases are not exclusive of others. Indeed, the State argues that the corroborating factors in the instant action are stronger to support a conviction. We disagree.

In *People v. Pazell* (1948), 399 Ill. 462, our supreme court addressed corroboration of a similar nature. In *Pazell*, the defendant was accused of sexually assaulting a 7-year-old child in his home. (399 Ill. at 464.) The victim's testimony was corroborated by a playmate, who stated that she was playing with the victim in the defendant's

backyard when the defendant told her to go home and took the victim into his house. (399 Ill. at 464.) While the court recognized that such things as eyewitness testimony and admissions or confessions of a defendant were a source of "substantial" corroboration, it held that the companion's testimony in the case before it placing the victim in the defendant's house was not sufficient. (399 Ill. at 467-68; see also *People v. Morgan* (1977), 69 Ill. 2d 200, 207; *People v. Kolden* (1962), 25 Ill. 2d 327, 330.) In *Kolden*, the court similarly found such corroboration insufficient, stating:

> "The State claims that the testimony of the prosecutrix was corroborated by her brother, *who placed defendant in the house alone with the prosecutrix, dressed in his undershorts.* We do not consider this to be substantial corroboration of the type suggested in *People v. Pazell* (1948), 349 Ill. 462 \*\*\*." (*Kolden*, 25 Ill. 2d at 330.)

Subsequently, in *Morgan*, the court noted that while testimony of a victim's parents placing the defendant in the home with the victim on the date in question might constitute "some corroboration," it was not substantial corroboration sufficient to sustain the conviction. *Morgan*, 69 Ill. 2d at 207.

In *People v. Leamons* (1984), 127 Ill. App. 3d 1056, 1067, the court distinguished *Pazell*, noting that the corroborating factors missing in *Pazell* were present in the case before it. In *Leamons*, the victim was taken into the trailer home of the defendant. (127 Ill. App. 3d at 1059-60.) Although there was not an eyewitness, the victim's brother testified that he overheard the defendant ask the victim whether it "hurt." (127 Ill. App. 3d at 1067.) Thus, the court held that the statements overheard by the victim's brother provided substantial corroboration to the victim's testimony. (127 Ill. App. 3d at 1067.) More recently, this court considered whether a victim's sister's eyewitness testimony substantially corroborated the victim's testimony. (See *People v. Daniels* (1987), 164 Ill. App. 3d 1055, 1075.) In *Daniels*, the corroborative testimony was wrought with inconsistencies; however, the court noted that it nonetheless mirrored the victim's testimony regarding such factors as when the offense occurred, where the offense began, that all of the participants were naked, and the nature of the assault. (164 Ill. App. 3d at 1076-77.) In holding that the sister's testimony substantially corroborated the victim's testimony, the court distinguished the corroborative testimony in the case before it from that presented in *Morgan* and *Kolden*. 164 Ill. App. 3d at 1076-77.

In the instant action, the court found as corroborating evidence

testimony regarding the close relationship between Echols and defendant, and House's and Nelson's testimony that all of the occupants of the apartment were together and that Echols slept in defendant's bedroom with the doors closed. None of these factors corroborate the occurrence of the sexual contact. Rather, each of these factors, like those presented in *Pazell*, *Morgan*, and *Kolden* corroborate only the existence of the *opportunity* to have the sexual contact. As the court stated in *Morgan*, testimony that defendant was in the same place as the victim, while constituting "some corroboration," did not constitute *substantial corroboration* sufficient to sustain the conviction. *Morgan*, 69 Ill. 2d at 207.

Accordingly, we hold that Echols' testimony was neither clear and convincing nor substantially corroborated such that defendant's conviction can be sustained. Defendant's conviction on count III is reversed.

Reversed.

UNVERZAGT and NASH, JJ., concur.